**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Judith Janusz

    v.                               Civil No. 12-cv-001-LM
                                          Opinion No. 2014 DNH 183

Northeast Utilities Service
Company and Public Service
Company of New Hampshire


**O R D E R**

In a case that has been removed from the Hillsborough County Superior Court, Judith Janusz originally sued her former employer in six counts, asserting claims for age discrimination and disability discrimination under federal and state law. Janusz has since consented to dismissal of three of her claims and, as a result, her case now consists of claims for age discrimination under: (1) the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. §§ 621-634 (Count I); and (2) New Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. ("RSA") ch. 354-A (Counts III and IV). Before the court is defendants' motion for summary judgment. Plaintiff objects. For the reasons detailed below, defendant's motion is denied.

**Summary Judgment Standard**

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) (quoting Cortés–Rivera v. Dept. of Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ. P. 56(a).  A factual "dispute [is] genuine if 'a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party . . . .'" Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)).  When ruling on a motion for summary judgment, the court must "view[] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Winslow v. Aroostook Cnty., 736 F.3d 23, 29 (1st Cir. 2013)) (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

    "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples,

Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). Thus, "[c]onclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." Travers, 737 F.3d at 146 (quoting Triangle Trading, 200 F.3d at 2). "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998) (internal quotation marks omitted).

## Background

Unless otherwise indicated, the following facts are undisputed. In 1996, Public Service Company of New Hampshire ("PSNH") hired Judith Janusz to work as a Customer Service Representative ("CSR") in its call center. In 2007, Janusz and all of PSNH's call-center employees became employees of Northeast Utilities Service Company ("NUSCO"). Janusz had two

3

main duties as a CSR, providing service over the telephone to customers who called in, and working over the radio to dispatch repair crews.  For her entire time at PSNH and NUSCO, she was assigned to the second shift, which ran from mid-afternoon to midnight.

As a CSR, Janusz was directly supervised by a Customer Service Supervisor, also known as a Team Lead.  At the times relevant to this matter, Janusz's initial Team Lead was Cassandra Powers.  Powers was later replaced by Lea Francoeur. Team Leads reported to a position known as "Supervisor-Customer Service," which was filled at all relevant times by Lori Levesque.  Levesque reported to David Slater, who was the call center's Customer Service Manager from 2009 onward.

In her affidavit, Janusz describes the following conduct to which she was exposed:

> 8.   I believe I was fired due to my age because there were regularly comments made to me about how old I was, and that it was almost time for me to retire, which I had no plans to do any time soon.  These comments started after Ms. Levesque . . . became my supervisor, in approximately 2005, when I was 57 years of age.
>
> . . . .
>
> 10.  Levesque, and sometimes David Slater, Call Center Customer Service Manager (from [the] time he was hired), both supervisory to me, repeatedly made comments including but not limited to these:

"You are the oldest one in Customer Service"

"Are you going senile?"

"I can't believe at your age that you work all of these hours"

"You would never know how old you are"

"For someone your age, you do a lot"

"You're too old to do that.  Let me do it"

"How long before you retire?  You must be close in age."

11.   Whenever I hesitated in answering a question, Gary Cronin (another supervisor), Slater and Levesque would say, "Tough to get old."  Mr. Cronin used to talk about my age, but I thought he was kidding at the time.  Becky Paquette, a supervisor on weekends, made comments about my age.

12.   Comments about my age started when I was in my late-50's, and occurred frequently (sometimes multiple times on one day, sometimes once after a three day break, and sometimes every day during the week), mostly by the above named supervisors, primarily Levesque.

13.   These comments made me feel like I did not matter to them; that I was insignificant.  Given how hard I worked, I thought I should not have been subjected to this treatment, I felt singled out, and it was hurtful.  The comments were embarrassing and demeaning.

14.   Levesque would post each person's birthday and/or years of service with the company on the reader board in Customer Service.  My milestone of ten years of service came and went, and my birthdays came and went.  When I finally mentioned the lack of

acknowledgement to Levesque, she said, "Do you really want everyone to know how old you are?"

Pl.'s Mem. of Law, Ex. 1 (doc. no. 21-2), at 2-3.

In the spring of 2010, both Janusz and her Team Lead, Powers, requested transfers to the first shift, by utilizing the company's "bid" process.  Janusz says she wanted to change shifts "to get out of the negative environment [and that she was] tired of hearing about her age, and the other comments from her supervisors." Janusz Aff. (doc. no. 21-2) ¶ 19.[1]  Both Janusz and Powers had their bids accepted in April.  When Janusz's bid was accepted, Levesque told her that her shift change would not happen until there was qualified back-up staff in place, probably in the early fall.  By July, Powers was moved into a first-shift Team Lead position, while, at the time of her August discharge, Janusz had yet to be transferred to a first-shift CSR position.

The record contains notes written by Francoeur documenting interactions she had with Janusz, on August 5 and 6, concerning the manner in which Janusz was carrying out her

---

[1] While Janusz's affidavit characterizes the negative environment of the second shift as including comments and conduct of a sexual nature as well as comments and conduct directed toward her physical abilities, the court draws the inference, favorable to Janusz, that the ageist comments alone were sufficient to motivate Janusz to seek a different shift.

dispatching duties.  On August 9, Levesque and Francoeur met with Janusz and issued her "a verbal warning . . . for insubordination and failure to follow established procedures." Defs.' Mem. of Law, Ex. G (doc. no. 17-8), at Janusz 510. Specifically, the memorandum documenting the August 9 meeting notes, among other things, incidents in which Janusz: (1) told Francoeur, loudly enough to be heard by other employees, that "she did not want [Francoeur] to tell her how to dispatch, she was going to do it her way and that she wanted [Francoeur] to leave her alone," id. at Janusz 511; (2) refused to comply with a request from Francoeur to take a phone call; and (3) responded to a request from Levesque to perform a task by telling Levesque that the task was Francoeur's job, not hers.

Later in the day on August 9, Janusz and Francoeur had a conversation that Janusz describes this way:

> On Monday, August, 9, 2010, the same day as the meeting with Francoeur and Levesque . . . Francoeur and I were talking about our friend Andrea, and she said she hadn't heard from her.  I said well, "I emailed her and left voicemails".  Francoeur then said in a joking manner, "if you hear from her and you don't tell me, I'm going to have to kill you," and I was trying to sign on to my computer and said something to the effect, "I guess I better be telling you when I hear from Andrea."

Janusz Aff. ¶ 28.

The next day, i.e., the day after Janusz received her
verbal warning, she was involved in a conversation with
Francoeur that she described at several points in her
deposition.  First, she said this:

> Q.   You understand that Ms. Francoeur reported
> that you made certain threats to her?
>
> A.   Yes.
>
> Q.   Including that you said you were going to
> kill her?
>
> A.   Yes.
>
> Q.   Did you say that to her?
>
> A.   Yes.  After she had said it to me.  And it
> was . . . in jest.
>
> Q.   I understand.  I'm going to break this down.
> So you agree with me that at some point you said to
> Ms. Francoeur I am going to kill you?
>
> A.   Not that way.
>
> Q.   What did you say?
>
> A.   We used to say it all the time.  And I just
> said I'm going to have to kill you, you know that,
> right?  And that was the gist of it.

Defs.' Mem of Law, Janusz Dep. (doc. no. 17-17) 58:7-23, Feb.
23, 2013.  Then, she referred to the incident again:

> Q.   And it was after that meeting [i.e., the
> meeting between Janusz, Francoeur, and Levesque] when
> the conversation occurred when you said you were going
> to kill her?

          A.   Yes.  Not in that way, again.

          Q.   And did you also say something about causing
     damage to her vehicle?

          A.   I said to her . . . I think I'm going to
     take all your gasoline, and then I said nah, I'll just
     let the air out of your tires.  And she goes oh, then
     if you do that then . . . you won't have to take the
     gas out.  I said okay, that's a good idea.

          Q.   Why did you say that to her?

          A.   Because that's how we used to talk to each
     other.

Id. at 61:3-13.

     At some point thereafter, Francoeur told Levesque what

Janusz had said to her about siphoning off her gasoline,

vandalizing her car, and killing her.  On August 13, Levesque

reported those comments to several NUSCO staff members: Slater,

Elaine Dame (Senior Staffing Consultant), Richard Chagnon (Human

Resources Manager), Robert Lizotte (Director, Human Resources),

Alicia Davenport (Senior Counsel), and Daniel Comer (Director,

Customer Service).  Then, Dame and Diane Charney (Human

Resources Business Partner) interviewed Janusz and Francoeur.

     Contemporaneous notes of those interviews describe

separately Francoeur's and Janusz's versions of the relevant

events.  The notes describe Francoeur's version this way:

     Later that evening [i.e., August 9], Judy [Janusz]
     stood up and leaned over Lea's cubicle wall and said:

You know Lea, if your tires are popped and there's no
air, then you'll know it.  Judy had an eeire look
(threatening) with an odd facial expression.  Lea was
taken aback because this came out of the blue, and
asked why she was saying that.  She was in disbelief
and the hair on her arm stood up.  Judy's expression
changed and she said she was just kidding.  Lea said
that it wasn't funny.  Judy then asked why did Lea
have to get Lori involved [with the issues that led to
the verbal warning] and Lea's response was that they
weren't going to go there.

.  .  .  .

Next night (8/10/10), Judy went to up Lea in her
cubicle and said she was going to kill her.  Lea
looked up and Judy was smiling and said she was only
kidding.  Lea did not have the same eeire feeling and
thought Judy was really just kidding.  Lea told Judy
that these types of statements were not a joke.

Defs.' Mem. of Law, Ex. J (doc. no. 17-11), at Janusz 531.  The

notes describe Janusz's version like this:

Her [Janusz's] version of the story was that it was a
single conversation.  I'm going to have to kill you,
but I can't do that – I prayed too hard for you when
you were sick.  I still wear my medal around my neck
for you.

Judy's version was that she was going to have to take
Lea's gas and steering wheel and flatten [her] tires.
Lea said you won't have to flatten my tires if you
take my gas.

Id. at Janusz 532.

On August 16, NUSCO management, including Levesque and

Slater, HR representatives, and in-house legal counsel held a

"consensus meeting" to discuss how NUSCO should respond to

Francoeur's reports of her encounters with Janusz.  After
examining a synopsis of Janusz's disciplinary record, which had
been prepared by Levesque, NUSCO management discussed Janusz'
employment status at a second "consensus meeting," in which
Slater participated.  "During that meeting, it was determined
that Ms. Janusz's employment should be terminated."  Defs.' Mem.
of Law, Dame Decl. (doc. no. 17-14) ¶ 22.  Shortly afterward,
Slater informed Janusz that NUSCO had decided to discharge her.
According to Janusz, Slater told her she that had been
discharged because she "created a hostile work environment."[2]
Janusz Dep. 58:5-6.

        This suit followed.

**Discussion**

        Janusz originally sued in six counts, asserting four claims
for age discrimination and two claims for disability
discrimination.  In response to defendants' motion for summary
judgment, Janusz assented to dismissal of the two disability-

---

        [2] The term "hostile work environment" is drawn from the
description of the August 10 incident that appears in the
synopsis of Janusz's disciplinary history that was prepared by
Levesque: "Judy violated her verbal warning by displaying
inappropriate and insubordinate behavior with a supervisor in
dispatch, failed to follow established procedures, and created a
hostile work environment."  Defs.' Mem. of Law, Ex. E (doc. no.
17-6), at Janusz 535.

discrimination claims.  With respect to age discrimination, her complaint includes: (1) a claim under the ADEA alleging two discriminatory employment actions (Count I); (2) a claim under the ADEA alleging a hostile work environment (Count II); (3) a claim under RSA 354-A alleging two discriminatory employment actions (Count III); and (4) a claim under RSA 354-A alleging a hostile work environment (Count IV).  In her objection to summary judgment, Janusz states that she "does not object to dismissal [o]f Count II, Hostile Work Environment, under the ADEA."  Pl.'s Partial Obj. (doc. no 21) ¶ 1.  Thus, this case now consists of the claims asserted in Counts I, III, and IV. That said, the court notes that a plaintiff bears the same burden of proof on age-discrimination claims brought under both the ADEA and RSA 354-A.  See Bresett v. City of Claremont, 218 F. Supp. 2d 42, 49 (D.N.H. 2002) (citing N.H. Dep't of Corr. v. Butland, 147 N.H. 676 (2002); Scarborough v. Arnold, 117 N.H. 803 (1977)).  Accordingly, the following discussion consists of one section devoted to Janusz's federal and state adverse-employment-action claims, and one section devoted to her state-law hostile-work-environment claim.

A. Adverse Employment Action (Counts I & III)

The heart of Counts I and III is Janusz's assertion "that she was not awarded a promotion and/or transfer for which she was qualified and promised, and she was fired for a pretextual reason."  Compl. (doc. no. 1-1) ¶ 32.[3]  Defendants move for summary judgment on Counts I and III, arguing that Janusz cannot establish that the reason NUSCO gave for her discharge was pretextual and that the real reason was her age.  Janusz disagrees categorically, identifying the following questions that require resolution by a factfinder: (1) whether her comment about killing Francoeur was a real threat or just a joke;[4] and (2) whether Levesque, when putting together her summary of Janusz's disciplinary history for the second "consensus meeting," tainted the decisionmaking process by including stale events, characterizing "coaching sessions" as disciplinary action, and failing to include positive comments about Janusz's

---

[3] At one point in her memorandum of law, Janusz characterizes the delay in moving her to the first shift as a part of her hostile-work-environment claim, see Doc. No. 21-1, at 21, but earlier in her memorandum, she refers to that as an adverse employment action, see id. at 12, just as she does in her complaint, see Doc. No. 1-1 ¶ 32.

[4] Whether Janusz's comment was a real threat or just a joke is not relevant because the pretext analysis focuses whether those who decided to discharge Janusz actually believed that she had threatened Francoeur.  See Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140-41 (1st Cir. 2012).

work from sources such as annual performance reviews.  Legally, Janusz relies upon the so-called "cat's paw" theory to impute Levesque's ageist animus to the group of managers and human resources personnel who made the decision to terminate her employment.

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  "The employee bears the burden of proving that [her] age was the but-for cause" of the employment action she challenges.  Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014).

> "Where, as here, the employee lacks direct evidence, [courts] utilize the burden-shifting framework developed by the Supreme Court to facilitate the process of proving discrimination."  Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123 (1st Cir. 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)).

> The first step of this framework requires the employee to establish his prima facie case by producing evidence that shows: "(1) that [she] was at least forty years old [at the time of the employment action at issue]; (2) that [her] job performance met the employer's legitimate expectations; (3) that [she] suffered an adverse employment action such as a firing; and (4) that the employer filled the position, thereby showing a continuing need for the services that [she] had been rendering."  Meléndez v.

14

Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010).
Doing so gives rise to a rebuttable presumption of
discrimination and shifts the burden of production —
but not persuasion — "to the employer to articulate a
legitimate, non-discriminatory reason for its
decisions." Vélez v. Thermo King de P.R., Inc., 585
F.3d 441, 447 (1st Cir. 2009) (internal quotation
marks omitted).  If the employer meets this burden,
"the focus shifts back to the plaintiff, who must then
show, by a preponderance of the evidence, that the
employer's articulated reason for the adverse
employment action is pretextual and that the true
reason for the adverse action is discriminatory."
Gómez-González v. Rural Opportunities, Inc., 626 F.3d
654, 662 (1st Cir. 2010) (internal quotation mark
omitted).  At the summary judgment stage, the
plaintiff need not prove [her] case, but must proffer
sufficient evidence to raise a genuine issue of
material fact as to whether [she] was fired [or
otherwise treated adversely] because of [her] age.
See Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d
424, 433 (1st Cir. 2000).

Adamson, 750 F.3d at 78-79 (parallel citations omitted).

For the purposes of summary judgment, defendants presume

that Janusz has established her prima facie case, and Janusz

does not challenge defendants' ability to articulate a

legitimate non-discriminatory reason for discharging her.  Thus,

the determinative issue is pretext.

When assessing pretext, the court must focus on the

perception of the decisionmaker, and whether he or she actually

believed the reason given for the adverse employment action.

See Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128,

140-41 (1st Cir. 2012) (citing Gray v. N.E. Tel. & Tel. Co., 792

15

F.2d 251, 256 (1st Cir. 1986)).  To demonstrate pretext, a plaintiff must show both that the proffered "explanation is unworthy of credence," id. at 141 (quoting Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)), and "that the pretextual reasons were 'intended to cover up the employer's real motive: age discrimination,'" id. at 143 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991)).  Finally, the court must bear "in mind that [it] should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Acevedo-Parrilla, 696 F.3d at 140 (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).

In this case, a reasonable jury could find that NUSCO's explanation for discharging Janusz, i.e., her creation of a "hostile work environment," is not credible.  Most importantly, it appears to be undisputed that Francoeur did not regard Janusz's August 10 comment about killing her as a threat, and that she believed Janusz was only joking.  In addition, while Francoeur did tell Dame and Charney that she was frightened by

16

the August 9 conversation concerning the possible vandalism of
her car, Janusz reported that Francoeur responded to her
comments about vandalism by making a joke in return.  Given that
evidence, which was presented to the participants in the second
"consensus meeting," a reasonable jury could find that the
participants in the "consensus meeting" did not believe that
they were discharging Janusz for creating hostility in her
workplace.  Therefore, it is for the jury to decide whether the
reason NUSCO gave Janusz for discharging her was the real reason
for her discharge.

Janusz has also created a factual issue regarding the
second part of the pretext analysis, i.e., the real reason for
her discharge.  Specifically, she has produced evidence that:
(1) both Levesque and Slater subjected her to verbal abuse that
directly referred to her age; (2) it was Levesque who reported
the incident between Janusz and Francoeur to NUSCO managers; (3)
both Levesque and Slater participated in the first "consensus
meeting"; (4) Levesque prepared the summary of Janusz's
disciplinary record for the participants in the second
"consensus meeting"; and (5) Slater participated in the second
"consensus meeting," i.e., the one at which NUSCO management
decided to discharge Janusz.  While neither Levesque nor Slater

was the sole decisionmaker, their influence upon the decision to discharge Janusz, and Slater's direct participation in that decision, are sufficient to allow a reasonable jury to impute their alleged ageist biases to NUSCO.  See Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 85 (1st Cir. 2004).

Because Janusz has created a triable issue of material fact concerning both the credibility of NUSCO's stated reason for discharging her and the real reason for that decision, NUSCO is not entitled to judgment as a matter of law on Counts I and III. Moreover, as the first theory on which Counts I and III are based, discriminatory discharge, must go to trial, there is no need, at this juncture, to address Janusz's second theory, i.e., that NUSCO discriminated against her by failing to transfer her to the first shift.

## B. Hostile Work Environment (Count IV)

Janusz also claims that she was subjected to a hostile work environment, animated by ageist animus.  That animus was expressed, Janusz claims, by the stream of ageist comments directed her way primarily by Levesque and Slater, and secondarily by several other supervisors.  Defendants move for summary judgment on Count IV, arguing that: (1) they are entitled to the protection of the Faragher-Ellerth affirmative

18

defense;[5] (2) compensatory damages are unavailable for a hostile-work-environment claim under the ADEA; and (3) the hostile work environment Janusz alleges was not sufficiently severe or persuasive to allow a verdict in her favor.  The court does not agree.

In Rivera-Rodríguez v. Frito Lay Snacks Caribbean, the court of appeals described the contours of a hostile-work-environment claim in the context of the ADA:

> To prove a hostile-work-environment claim, a plaintiff must provide sufficient evidence from which a reasonable jury could conclude that the offensive conduct "is severe and pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive." Landrau-Romero [v. Banco Popular De P.R.], 212 F.3d [607,] 613 [(1st Cir. 607)].  When assessing whether a workplace is a hostile environment, courts look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance.  Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

265 F.3d 15, 24 (1st Cir. 2001) (abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)) (parallel citations omitted).

---

[5] See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

Where, as here, the conduct on which a hostile-work-environment claim is based is the conduct of a supervisor, "the employer is vicariously liable." Gerald v. Univ. of P.R., 707 F.3d 7, 20 (1st Cir. 2013) (citations omitted)).  However, under certain circumstances, an employer may be shielded from liability by the Faragher-Ellerth defense,

> which requires the employer to show by a preponderance of the evidence that it both "exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and that the "employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."

Id. at 20 n.5 (quoting Ellerth, 524 U.S. at 765).  However, where a tangible employment action has been taken against the employee, the Faragher-Ellerth defense is unavailable.  See Gerald, 707 F.3d at 20 n.5 (citations omitted); see also Ellerth, 524 U.S. at 765 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.").  Because Janusz's discrimination claims based upon her discharge survive summary judgment then, necessarily, the Faragher-Ellerth defense is unavailable to defendants.

Turning to defendants' next argument, Janusz concedes that compensatory damages are not available under the circumstances of this case for a hostile-work-environment claim arising under the ADEA.  But, Janusz has abandoned her ADEA hostile-work-environment claim.  Because defendants have not shown that such damages are unavailable for Janusz's corresponding claim under RSA 354-A, they have not shown that they are entitled to judgment as a matter of law on Count IV.

Finally, the court also rejects defendants' argument that Janusz cannot prove an adequately hostile work environment.  "As [the First Circuit has] observed, the hostile environment question is commonly one of degree – both as to severity and pervasiveness – to be resolved by the trier of fact on the basis of inferences drawn from a broad array of circumstantial and often conflicting evidence."  Billings v. Town of Grafton, 515 F.3d 39, 50 (1st Cir. 2008) (quoting Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002); Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1988)).  But, beyond that, Janusz will testify that she was subjected to dozens, if not hundreds, of offensive comments related to her age, and that those comments spanned several years.  The court cannot conclude, as a matter

of law, that Janusz will be unable to prove that she was subjected to a hostile work environment based on her age.

Because Janusz has created a triable issue of material fact concerning the severity of the age-based hostility in her work environment, NUSCO is not entitled to judgment as a matter of law on Count IV.

## Conclusion

For the reasons detailed above, defendants' motion for summary judgment, document no. 17, is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge


September 4, 2014

cc:   Leslie H. Johnson, Esq.
      William D. Pandolph, Esq.

22